UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------X

Henry C. Fleary,

       Plaintiff,                CV-04-1557 (CPS)

   - against -            MEMORANDUM OPINION
                             AND ORDER
State of New York Mortgage Agency and
New York State Housing Finance Agency,

       Defendants.

-----------------------------------------X

SIFTON, Senior Judge.

     Plaintiff Henry C. Fleary brings this action against

Defendants State of New York Mortgage Agency ("SONYMA") and New

York State Housing Finance Agency ("NYSHFA") (together "The

Agency") alleging violations of (1) Title VII of the Civil Rights

Act of 1964; (2) Section 296 of the Human Rights Law of the State

of New York; (3) 42 U.S.C. § 1981 and (4) Title VIII of the New

York City Administrative Code.  Plaintiff seeks compensatory,

punitive and special damages for injury caused by the Agency's

allegedly intentional discriminatory conduct, in (1) paying him

less than similarly situated white employees; (2) demoting him;

(3) creating a hostile work environment; and (4) constructively

discharging him.  Presently before the Court is the Agency's

motion for summary judgment pursuant to Federal Rule of Civil

Procedure 56.  For the reasons that follow, the motion is

granted.

**BACKGROUND**

The following facts are drawn from the parties' Local Rule 56.1 statements, affidavits, depositions, and exhibits submitted in connection with this motion. They are undisputed except where noted.

Plaintiff Henry C. Fleary, a 45-year old African-American male, began working for SONYMA[1] as a Mortgage Accountant in March 1988 at an annual salary of $24,283. In 1990, Fleary was promoted to Mortgage Accounting Representative and received a $1,500 increase in annual salary. In April 1993, Fleary was promoted to First Mortgage Accountant. In June 1997, Fleary was promoted to Mortgage Accounting Supervisor,[2] and received a $1,600 increase in his annual salary. He remained, however, within Salary Band VI to which he had been assigned at the time

---

[1] The State of New York Mortgage Agency ("SONYMA") purchases existing mortgages from banks and funds new mortgages on residential real property for low and moderate income families. N.Y. Pub. Auth. Law §§ 2400-2429(f) (McKinney 1995). New York State Housing Finance Agency ("NYSHFA") New York State Housing Finance Agency ("NYSHFA") finances, and encourages private investment in, multiple family housing developments as well as aged care and handicapped facilities for persons of low and moderate income. N.Y. Priv. Hous. Fin. §§ 40-62 (McKinney 2002). The two agencies were integrated in 1994. (Def.'s Ex. F at 1-2.)

[2] The principal duties of a Mortgage Accounting Supervisor included supervision of mortgage accounting staff, resolving problems with client banks, and preparing or overseeing the preparation of reports reconciling the loan transactions performed by SONYMA. (Def.'s Ex. E at 3.) The position required an associate or baccalaureate degree in accounting or a related subject, four years experience as "Supervisory Mortgage Accountant," knowledge of automated mortgage systems, and the ability to work independently. (*Id.*) Before Fleary's promotion, the position had been vacant for approximately four years. (Def.'s Ex. F at 2.)

of the integration of the two entities in 1994.[3]  At the time of

his promotion, Fleary states that he made a formal request to the

Deputy Chief Financial Officer, Joanne Hounsell, to raise his

Salary Band from VI to VII, and that his request was denied.

Fleary did not complain to any administrative agency or court

regarding his salary level after this denial, nor did he request

that his Union contest it.  (Def.'s Rule 56.1 Statement, ¶ 28-29;

Pl.'s Ex. C, Admis. 114.)  Fleary's salary was within the range

established by the Agency for his salary band and not in

violation of the Collective Bargaining Agreement.[4]  Of the 10

employees in the SONYMA Accounting Department, only Fleary's

supervisor, Assistant Vice President and Assistant Comptroller,

Henry Hauk, who is white, and Nora Rubio, an employee of Asian

descent whom Fleary supervised but who had been with the Agency

since 1981 and had seven years seniority over Fleary, had higher

---

[3] Under the Collective Bargaining Agreement ("CBA"), which took effect
when the two agencies were integrated and moved to the same location in 1994,
eligible employees were assigned to one of eleven "Salary Bands", each of
which establish a range for salaries available within that band. (Def.'s Ex. E
at 1-2; F at 1-2.)  The ranges overlap, however, and compensation for one
position may fall within more than one salary band.
    Whereas NYSHFA was a unionized, civil service agency, SONYMA was not a
civil service agency, and was not unionized until 1994 when it integrated with
NYSHFA. The integration of the two agencies included an integration of
salaries, benefits, and a new collective bargaining agreement. (Def.'s Ex. F,
at 1-2.)

[4] For example, in March 2000, when Fleary's Section 1981 and state law
claims would not have been barred by the applicable statutes of limitations
discussed *infra*, the Band VI salary range was $41,524 to $76,400 and Fleary
earned $47,048.  In May 2002, when his Title VII claim would not have been
barred, the Band VI salary range was $44,400 to $81,900 and Fleary earned
$53,569.  (Def.'s Ex. E at 8, 14.)

salaries than Fleary.  (Def.'s Ex. Y at 1; Def.'s Rep. Ex. E at
1, 16.)

Fleary's salary was, however, lower than all but one of the
employees in the NYSHFA General Ledger Department, to which he
was transferred in 2002 under circumstances discussed below.
Among those who earned more than Fleary in the NYSHFA General
Ledger Department were Joel Danzig, a white Senior Accountant
also in Salary Band VI, who had been employed with the Agency
since 1965, Dominic Martello, a white Salary Band VI Assistant
Accountant, who had one year less seniority than Fleary, and
Steven Solomon, a white Senior Accountant in Salary Band VII who
had been with the Agency since 1980.  (Def.'s Ex. F; Y; Def.'s
Rep. Ex. E; Dalley Decl. ¶ 40.)

June Vogt, a white Senior Loan Officer in Salary Band VII,
who was hired by SONYMA in 1988 and worked in the Agency's Single
Family Department since 1993, also earned more than Fleary.
(Def.'s Ex. F at 3-5; Dalley Decl. ¶ 44.)

Fleary's performance was consistently rated "satisfactory"
or above on annual performance appraisals from 1989 until 2001.
(Pl.'s Ex. 11.)

On February 16, 2001, Nora Rubio was insubordinate and
aggressive when Fleary confronted her about a missed deadline.
(Def.'s Ex. S at 14-15.)  In August 2001, Rubio again refused to
follow Fleary's directions, and became abusive to Fleary and to a

Deputy Chief Financial Officer who intervened. Following an internal investigation and disciplinary hearings on November 16, 2001 and October 17, 2002, Rubio's conduct was deemed insubordinate and abusive, and she was suspended without pay for three weeks, commencing on February 27, 2003. (Def.'s Ex. S at 20-21, 26; T.)[5] Fleary does not allege, and the Agency's disciplinary report against Rubio did not find, that Rubio's conduct was motivated by racial animus against Fleary. (Def.'s Ex. P; Q; S.)

In February 2002, Inga Barrington, an African-American employee whom Fleary supervised, made a formal accusation of sexual harassment against him.[6] Barrington was immediately removed from Fleary's supervision. In July 2002, an internal investigation concluded that Barrington's allegations had no merit and were lodged "recklessly." Because the Agency "[could not] conclude with absolute certainty that Mr. Fleary, over a 14 year period at the agency, never asked Ms. Barrington out on a date or made an off-color comment," it chose not to terminate

---

[5] The Agency's initial complaint against Rubio also included charges of incompetence and other misconduct, and recommended that her employment be terminated. (Def.'s Ex. S.)

[6] In March 2000, Barrington had made generalized allegations of sexual harassment against Fleary, but withdrew her complaint after a meeting with the Agency's Labor Counsel and Deputy Chief Financial Officer Hounsell. (Def.'s Rule 56.1 Statement, ¶¶ 39-40.) In an inter-office memorandum dated March 13, 2000, Hounsell states that after Barrington withdrew her sexual harassment charge, Fleary was asked whether he would be able to work with Barrington, and Fleary responded that "he [knew] his professional responsibilities, and that he would be able to work with her." (Def.'s Ex. M at 2; Hounsell Decl. ¶ 23.) In October 2001, Fleary attended a sexual harassment in the workplace training session. (Pl.'s Ex. C, Admis. 39.)

Barrington's employment. (Def.'s Ex. N at 4.) The report recommended that Barrington be removed from Fleary's supervision permanently, and Barrington was suspended without pay for five days. Fleary states that in August 2002, his supervisor, Henry Hauk, informed Fleary that "[Fleary] should prepare . . . to take a hit from management because of the embarrassment the investigation caused higher-ups." (Def.'s Ex. AA, Fleary Dep. 54, lines 8-11.)

At a September 17, 2002 meeting, the Agency's Chief Financial Officer announced a reorganization of the SONYMA and NYSHFA accounting departments.[7] Shortly after the meeting, Fleary met with Thomas Hamm, the Comptroller, who informed Fleary that he was being transferred from SONYMA's accounting department to NYSHFA's general ledger department, that his position was being changed to that of Senior Accountant, and that his salary was being increased by $2,000 per year.[8] Fleary told Hamm that "[he was] shocked that [he] was being stripped of [his] supervisory duties." (Def.'s Rep. Ex. I, Fleary Dep. 52.)

---

[7] The September 2002 reorganization affected sixteen employees. Three employees, including Mr. Fleary, received a title change and a salary increase; six employees received title changes without a salary increase; six retained their titles but received salary increases; and one was transferred without title change or salary increase. (Def.'s Ex. E at 3-4; Y.)

[8] The principal duties of Senior Accountants were to develop, examine, review and analyze financial and accounting records, and to prepare related reports. Senior Accountants must have completed a 4-year college course and earned a degree in accounting, have had one to three years of accounting experience, have knowledge of computer software, and be able to work with a minimum of supervision. The Senior Accountant position spans salary bands VI, VII and VIII with a maximum salary of $105,700. (Def.'s Rule 56.1 Statement, ¶ 111; Def.'s Ex. F at 10.)

Fleary characterizes the job transfer as a demotion since it eliminated his supervisory responsibilities. The Agency maintains that the job change was a promotion, affording him greater opportunity for advancement, increased responsibility, and greater earning potential.

Fleary reported to work the day after the reorganization was announced. The next day, Thursday, September 19, he took sick leave, and went to see his psychiatrist at the HIP Brooklyn Mental Health Service clinic, Dr. Leatrice Simpson. (*Id.* at 248.) In a letter dated September 19, 2002, Dr. Simpson stated that Fleary had been undergoing treatment for depression since April 29, 2002, and could not return to work at that time. (Pl.'s Ex. 3 at 1.) Fleary nevertheless returned to work on Friday, September 20. However, on Sunday, September 22, 2002, he went to his office, cleared out his desk, took certain personal items home, printed out some emails pertaining to the sexual harassment investigation, and deleted those files from his computer. (Def.'s Rule 56.1 Statement, ¶¶ 129-132; Def.'s Rep. Ex. I, Fleary Dep. 248.) Based on a subsequent diagnosis by Dr. Simpson that stated that Fleary was suffering from Major Depressive Disorder and could not return to work, Fleary remained on paid sick leave for the remainder of the year. (Pl.'s Ex. 3.)[9]

---

[9] On November 14, 2002, in connection with a claim to the U.S. Department of Labor under the Family Medical Leave Act, Dr. Simpson diagnosed Fleary as suffering from Major Depressive Disorder, stating that it was a

On January 6, 2003, Fleary filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC), claiming that the Agency's officers, including Joanne Hounsel, Deputy Chief Financial Officer, Thomas Hamm, Comptroller of SONYMA and NYSHFA, and Henry Hauk, Assistant Vice-President of the SONYMA Accounting Department, (1) allowed a pattern of harassment, resulting in a hostile work environment, to remain and persist from March 1, 2000 to September 20, 2002 that interfered with Fleary's ability to perform his job; (2) discriminated against Fleary because of his race from June 1997 to the date of filing his charge by paying Fleary substantially less than similarly situated white employees; and (3) discriminated against Fleary by demoting him rather than supporting his efforts to deal with difficult employees. (Pl.'s Ex. 1.)

On January 15, 2003, Dalley advised Fleary that his accrued leave would be exhausted on January 23, 2003,[10] and that he might be eligible to receive half-pay pursuant to the Agency's

---

chronic condition, that he was "incapacitated" under the FMLA, and unable to perform work at that time. (Pl.'s Ex. 3 at 3.) Incapacity for FMLA purposes "is defined to mean inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefor, or recovery therefrom." (*Id.*)

[10] The Agency's Collective Bargaining Agreement, dated May 1999 provides, "[a]n employee may not take more than a total of four (4) months leave, or combinations of leave, of any kind, in any twelve (12) month period . . ." (Def.'s Ex. J at 30.)

Collective Bargaining Agreement ("CBA"),[11] but that additional information was required regarding his illness and his plans to return to work. (Def.'s Ex. Z at 13-14.) Dalley also informed Fleary that the Agency had retained a psychiatrist to meet with him to evaluate his condition and his medical records and to discuss his condition with his health care providers.

The psychiatrist appointed by the Agency, Dr. Steven Erle, met with Fleary on February 5, 6 and 7, 2003, and reviewed Fleary's psychiatric records from the HIP Brooklyn Mental Health Service Clinic. In a report dated March 7, 2003, Dr. Erle concluded that Fleary was suffering from Adjustment Disorder with Mixed Disturbance of Emotions and Conduct, and that his symptoms did not appear to satisfy the diagnostic criteria for a Major Depressive Episode. He concluded that Fleary was "capable of returning to work on a regular and consistent basis," and that his return would be facilitated by continuing psychiatric and psychotherapeutic support and contact. (*Id.* at 22.)

On March 14, 2003, Dr. Janet Taylor, another psychiatrist at HIP Brooklyn Mental Health Service, stated on a claim form to the U.S. Department of Labor under the Family Medical Leave Act that Fleary was suffering from Major Depressive Disorder, was incapacitated under the FMLA's definition, was unable to work,

---

[11] The CBA provides that "the Agency will grant sick leave at half pay for personal illness to full time employees eligible for such leave," and requires, among other things, satisfactory medical documentation of illness by a doctor approved by the Agency. (Def.'s Ex. K at 3-4.)

and was being treated with psychotherapy and anti-depressants.
(Pl.'s Ex. 3 at 8-9.)

On March 17, 2003, Dalley denied Fleary's request for
additional sick leave at half pay on the basis of Dr. Erle's
report, informed Fleary that the Agency intended to restore him
to his Senior Accountant position effective March 21, and told
him that he was to report to Comptroller Hamm's office on that
day. Fleary did not report to work, nor did he attempt to
contact the Agency to explain his absence. On March 25, Dalley
wrote to Fleary regarding his continued absence, and informed him
that he had ten days to provide an explanation for his
unauthorized absence, or the Agency would terminate his
employment pursuant to provisions of the CBA.[12] (Def.'s Ex. Z at
25.) Fleary did not respond to this letter, and on April 9,
Dalley informed Fleary that pursuant to the CBA, he was deemed to
have resigned his employment with the Agency due to his
unauthorized absences. (*Id*. at 27.)

In a letter forwarded by Fleary's counsel to the Agency
dated April 14, 2003 and entitled "Forensic Response to the
Psychiatric Evaluation of Mr. Henry C. Fleary conducted by Dr.
Steven R. Erle and dated March 7, 2003," Dr. Albert Crum

---

[12] The CBA provides, "[a]ny employee absent from work without
authorization for a period of ten (10) working days following notice from the
Agency . . . shall be deemed to have resigned from his or her position if he
or she has not provided a satisfactory explanation to his/her supervisor for
such absence on or before the eleventh working day following such
notification." (Def.'s Ex. J at 36.)

criticized the findings of Dr. Erle's report, the Agency's treatment of Fleary's condition, and the denial of Fleary's request for sick leave with half pay. (Pl.'s Ex. 2.) In an email dated April 16, 2003, Fleary stated that he was "shocked at the Agency's decision to wrongfully terminate [his] employment," and asked the Agency to reconsider. (Def.'s Ex. Z at 29.) In an April 21 letter to Fleary, Dalley restated the Agency's policy regarding unauthorized absences, detailed Fleary's failure to comply with the Agency's demands, and stated that Fleary's employment was "deemed terminated by resignation." (*Id*. at 3.)[13]

On January 16, 2004, the EEOC issued its determination that it "[was] unable to conclude that the information obtained establishes a violation of the statutes." (Def.'s Ex. G.) In its Dismissal and Notice of Rights, the EEOC informed Fleary of his right to file a claim against the Agency in federal court within 90 days. (*Id*.)

Fleary timely filed this complaint against the Agency on April 15, 2004 alleging violations of (1) Title VII of the Civil Rights Act of 1964; (2) 42 U.S.C. § 1981; (3) Section 296 of the

---

[13] On August 25, 2003, an Unemployment Insurance Appeal Board decision by Administrative Law Judge Viren Pergadia ("ALJ") states that, contrary to a May 29, 2003 determination by the Department of Labor, Fleary did not quit his job, but was fired after he failed to return to work following a medical leave of absence. (Def.'s Rep. Ex. D at 2.) The ALJ stated that Fleary had credibly testified that he had not returned to work on the advice of his doctors, and therefore had a compelling reason for failing to return. For these reasons, the ALJ stated that Fleary had not misrepresented his discharge as a firing rather than a voluntary separation, and was therefore eligible for unemployment benefits. (*Id*.)

Human Rights Law of the State of New York; and (4) Title VIII of the New York City Administrative Code.  On July 8, 2005, the Agency filed this motion for summary judgment pursuant to Federal Rule of Civil Procedure 56.

**DISCUSSION**

Jurisdiction

The Court has jurisdiction over Fleary's Title VII and 42 U.S.C. § 1981 claims pursuant to 28 U.S.C. § 1331, and over his New York state law claims pursuant to 28 U.S.C. § 1367(a), which provides supplemental jurisdiction over state law claims.

Summary Judgment Standard

Summary judgment is appropriate "[w]hen the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Rule 56 of the Federal Rules of Civil Procedure provides for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party seeking summary judgment has the burden of demonstrating that no genuine issue of material fact exists.

*Apex Oil Co. v. DiMauro*, 822 F.2d 246, 252 (2d Cir. 1987). In order to defeat such a motion, the non-moving party must raise a genuine issue of material fact. Although all facts and inferences therefrom are to be construed in the light most favorable to the non-moving party, the non-moving party must raise more than a metaphysical doubt as to the material facts. *See Matsushita*, 475 U.S. at 586; *Harlen Assoc. v. Vill. of Mineola*, 273 F.3d 494, 498 (2d Cir. 2001). The non-moving party may not rely on conclusory allegations or unsubstantiated speculation. *Twin Labs., Inc., v. Weider Health & Fitness*, 900 F.2d 566, 568 (2d Cir. 1990). Rather, the non-moving party must produce more than a scintilla of admissible evidence that supports the pleadings. *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289-90 (1968); *Niagara Mohawk Power Corp. v. Jones Chem. Inc.*, 315 F.3d 171, 175 (2d Cir. 2003).

The trial court's function in deciding such a motion is not to weigh the evidence or resolve issues of fact, but to decide instead whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving party, there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000).

*Rule 56.1*

The Agency argues initially that its motion for summary judgment should be granted because plaintiff Fleary failed to comply with applicable Federal Rules of Civil Procedure and the Local Rules of the Eastern and Southern Districts of New York. The Agency claims that Fleary submitted multiple versions of his papers, did not file his opposition papers electronically, failed to controvert the facts set forth in Defendants' Rule 56.1 Statement with correspondingly numbered paragraphs in Plaintiff's Rule 56.1 Statement, and did not rely on admissible evidence. In addition, the Agency states that Fleary's response to the Agency's Request for Admissions was not properly served on the defendant. For these reasons, the Agency argues that the facts set forth in the Agency's Rule 56.1 Statement should be deemed uncontroverted, and its motion for summary judgment granted.

As the Court of Appeals has recognized, "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001)(citations omitted). Even in cases in which the opposing party fails to file a response under Rule 56.1, "a district court may conduct a review of the record to determine if summary judgment is appropriate." *Every v. Makita U.S.A., Inc.*, No. 02-CV-8545, 2005 WL 2757952, *7 (S.D.N.Y. October 24, 2005). Here, Fleary's submissions are

inadequate and untimely but have caused defendants no prejudice and appear inadvertent. Accordingly, I exercise my discretion to review the submissions independently, disregarding any assertions not supported by the papers submitted. *See Holtz*, 258 F.3d at 74.

## Employment Discrimination Claims

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2. Fleary alleges that (1) he was paid less than similarly situated white employees; (2) the job change from Mortgage Accounting Supervisor to Senior Accountant constituted a demotion because he was relieved of supervisory duties; (3) the Agency created a hostile work environment by not supporting him when confronted with difficult employees under his supervision; and (4) he was constructively discharged. The Agency contends that (1) Fleary's salary claims are time-barred; (2) Fleary has not presented evidence of discrimination as a basis for either his adverse job transfer or hostile work environment claims and (3) this court lacks jurisdiction to consider Fleary's constructive discharge claim because it was not reasonably related to his January 2003

EEOC claim.

Liability and burdens of proof for employment discrimination claims pursuant to § 1981 are analyzed under the same framework as for Title VII claims. *McPherson v. NYP Holdings, Inc.*, No. 03-CV-4517, 2005 WL 2129172, *2 (E.D.N.Y. September 1, 2005); *Murray v. Board of Educ. of City of New York*, 984 F.Supp. 169, 179 (S.D.N.Y. 1997)(citations omitted).[14] New York courts pursue the same analysis for claims brought under § 296 of the New York State Human Rights Law[15] and Title VIII of the New York City Administrative Code.[16] *McPherson*, 2005 WL 2129172, *2(citing *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 565 (2d Cir. 2000). Accordingly, Fleary's state law and § 1981 claims may be considered together with his Title VII claims.

---

[14] 42 U.S.C. § 1981 provides: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens . . ." 42 U.S.C. § 1981(a).

Congress amended § 1981 to apply to "all phases and incidents of the contractual relationship, including discriminatory contract terminations." *Rivers v. Roadway Exp., Inc.*, 511 U.S. 298 (1994); *See* 42 U.S.C. § 1981(b).

[15] New York's Human Rights Law provides: "1. It shall be an unlawful discriminatory practice:(a) For an employer or licensing agency, because of the age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, or marital status of any individual, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."  N.Y. Exec. Law § 296(1)(a)(McKinney 2005).

[16] New York City Administrative Code § 8-107 provides: "It shall be an unlawful discriminatory practice: (a) For an employer or an employee or agent thereof, because of the actual or perceived age, race, creed, color, national origin, gender, disability, marital status, sexual orientation or alienage or citizenship status of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment."  NYC Code § 8-107(1)(a).

*The Agency's Statute of Limitations Defense*

The Agency argues that Fleary's claim that he was paid less than similarly situated white employees is barred by the applicable statute of limitations under both State and Federal law. In New York, the statute of limitations for filing a discrimination claim under Title VII with the EEOC is 300 days. 42 U.S.C. § 2000e-5. N.Y. Human Rights Law § 296, and N.Y. City Administrative Code § 8-502 allow plaintiffs three years from the date of the injury allegedly caused by discrimination to file suit. § 1981 claims are not subject to the statute of limitations for Title VII claims, but are subject to the statute of limitations for personal injury claims, which in New York is also three years. *See Tadros v. Coleman*, 898 F.2d 10, 12 (2d Cir.), cert. denied, 498 U.S. 869 (1990).

However, "a salary structure that was discriminating before the statute of limitations passed is not cured of that illegality after that time passed, and can form the basis of a suit if a paycheck resulting from such a discriminatory pay scale is delivered during the statutory period." *Forsyth v. Federation Employment and Guidance Service*, 409 F.3d 565, 572-573 (2d Cir. 2005)(citing *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 111-113 (2002); *Bazemore v. Friday*, 478 U.S. 385, 395-96

(1986)).[17]  Accordingly, each paycheck that Fleary received after March 12, 2002 (300 days prior to January 6, 2003 when the EEOC charge was filed) constituted a discrete act of discrimination for the purposes of a charge under Title VII.  So too, each paycheck that Fleary received after January 6, 2000 (three years prior to the EEOC filing) constituted an allegedly discriminatory act for Fleary's state, city and § 1981 claims.

*Evidence of Discrimination for Claims Not Barred*

To succeed on a Title VII discrimination claim, a plaintiff must first offer "evidence adequate to create an inference that an employment decision was based on a discriminatory criterion illegal under the Act."  *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 358 (1977).  Where there is no direct evidence of discrimination, a plaintiff may raise an inference of discrimination by introducing evidence that the plaintiff (1) was in a protected class, (2) satisfactorily performed his duties, (3) and suffered an adverse employment action, (4) under circumstances that gave rise to a presumption of discrimination.  *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  It is not disputed that Fleary, an African-

---

[17]  Because "discriminatory pay scales are not continuing violations," damages may only be recovered for salary received within the period of time not barred by the statute of limitations.  *Forsyth,* 409 F.3d at 573 (*citing Pollis v. New Sch. for Soc. Research*, 132 F.3d 115, 118-119 (2d Cir.1997)).

American with consistently positive performance appraisals,
satisfies the first two elements of a prima facie case.  However,
the Agency contends that Fleary fails to establish that he
suffered a cognizable adverse action under circumstances that
give rise to a presumption of discrimination.

To establish a presumption of discrimination, a plaintiff
may show that the defendant subjected the plaintiff to disparate
treatment, that is, treated him less favorably than a similarly
situated employee or employees not part of his protected group.
*Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir.
2000)(citations omitted); *see McGuinness v. Lincoln Hall*, 263
F.3d 49, 54 (2d Cir. 2001)(stating that it is "sufficient that
the employee to whom plaintiff points be similarly situated in
all material respects. . . [and] must have a situation
sufficiently similar to plaintiff's to support at least a minimal
inference that the difference of treatment may be attributable to
discrimination.")  "The burden a plaintiff, alleging that he was
discriminated against by his employer, carries to survive a
summary judgment motion at the prima facie stage is a minimal
one."  *Graham,* 230 F.3d at 38 (*citing St. Mary's Honor Ctr. v.
Hicks*, 509 U.S. 502 (1993)).

Once a plaintiff has established a prima facie case, the
burden shifts to the defendant to rebut the presumption of
discrimination by presenting a legitimate, non-discriminatory

reason for the adverse employment action. *Burdine*, 450 U.S. at 254-55. "The employer's burden here is one of production of evidence rather than one of persuasion. . . The defendant need only articulate--but need not prove--the existence of a non-discriminatory reason. *Fisher v. Vassar College,* 70 F.3d 1420, 1433 (2d Cir. 1995)(citing *Burdine*, 450 U.S. at 254-55). "[I]f the employer articulates a nondiscriminatory reason for its actions, the presumption of discrimination is rebutted and it 'simply drops out of the picture.'" *LaGrande v. Key Bank National Assn.*, No. 00-CV-01195, 2005 WL 2402519, *6 (E.D.N.Y. September 28, 2005)(citing *St. Mary's,* 509 U.S. at 510-11).

The burden then shifts to the plaintiff "to prove that discrimination was the real reason for the employment action," *Graham*, 230 F.3d at 38 (citing *Burdine*, 450 U.S. at 256), or to "come forward with evidence that the defendant's proffered, non-discriminatory reason is a mere pretext for actual discrimination." *Weinstock v. Columbia University*, 224 F.3d 33, 42 (2d Cir. 2000). "The plaintiff must produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the [defendant] were false, and that more likely than not [discrimination] was the real reason for the [employment action]." *Id*. (internal quotations and citations omitted). "To get to the jury, '[i]t is not enough ... to disbelieve the

employer; the factfinder must [also] believe the plaintiff's explanation of intentional discrimination.'" Weinstock, 224 F.3d at 42(citing St. Mary's, 509 U.S. at 519). "Thus, once the employer has proffered its nondiscriminatory reason, the employer will be entitled to summary judgment . . . unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination." *James v. New York Racing Ass'n*, 233 F.3d 149, 154 (2d Cir. 2000)(citing *St. Mary's*, 509 U.S. at 510-11; *Burdine*, 450 U.S. at 255-56; *Fisher*, 114 F.3d at 1336).

**Discriminatory Pay**

"[W]here a plaintiff seeks to make out [a] prima facie case by pointing to the disparate treatment of a purportedly similarly situated employee, the plaintiff must show that [he] shared sufficient employment characteristics with that comparator so that they could be considered similarly situated." *McGuinness*, 263 F.3d at 53. Job responsibilities and seniority may be used to determine whether a plaintiff is similarly situated to other employees. *See, e.g.*, *Jones v. Yonkers Pub. Schs*., 326 F. Supp. 2d 536, 545 (S.D.N.Y. 2004).

### 1. Fleary's Prima Facie Case

To establish that the Agency paid him a lower salary than similarly situated white employees, Fleary submits as evidence the employee records that the Agency provided at the request of the EEOC investigator. (Pl.'s Ex. 8.) Fleary argues that two

white employees, Steven Solomon and June Vogt received promotions
and permanent salary increases whereas he was given only a "one-
time" bonus, and remained in Salary Band VI.[18]  After being
transferred to the NYSHFA General Ledger Department in 2002,
Fleary was the department's lowest paid employee, with the
exception of a secretary in Salary Band IV.  Two white
accountants in NYSHFA General Ledger Department classified in
Salary Band VI, Joel Danzig and Dominic Martello, were paid more
than him.  There is thus evidence that he was paid less than a
white employee with less seniority, Dominic Martello, and a
question of fact as to whether employees outside his protected
group to whom Fleary compares himself were similarly situated.
*See Graham,* 230 F.3d at 38; *Mandell v. County of Suffolk & John
Gallagher*, 316 F.3d 368, 379 (2d Cir. 2003) ("Whether two
employees are similarly situated is ordinarily a question of fact
for the jury.")  Fleary has accordingly raised a rebuttable
presumption of discrimination on the basis of race.  The burden
of production as a result shifts to the Agency to present

---

[18] Fleary argues that when he was promoted to Mortgage Accounting
Supervisor in 1997, his formal request for an increase in his Salary Band was
rejected.  I need not consider whether any such request and rejection
occurred, because even if it did, the claim would be barred by the 300-day and
three-year statutes of limitations for providing a basis for Title VII, § 1981
or state discrimination claims.  42 U.S.C. § 2000e-5; 42 U.S.C. § 1981; N.Y.
Exec. Law § 296; N.Y. Admin. Code § 8-502; *Tadros*, 898 F.2d at 12 (for § 1981
claims).  As discussed above, it is only the receipt of allegedly
discriminatory pay within the statutes of limitations periods that is
actionable, not discrete acts that occurred prior to March 12, 2002 and
January 6, 2000.

legitimate, non-discriminatory reasons for the pay differentials to rebut the presumption of discrimination.  *Burdine*, 450 U.S. at 279-80.

## 2. Non-discriminatory Reasons for Fleary's Salary

The Agency contends that Fleary at all times received a salary within the ranges established by the Collective Bargaining Agreement, negotiated as a result of the integration of the two agencies.  (Def.'s Ex. E at 8, 14.)  The only employees with higher salaries in the SONYMA Accounting Unit in which Fleary was employed until September 2002 were Fleary's supervisor, Henry Hauk, the Assistant Vice President and Assistant Comptroller, and Nora Rubio, an Asian woman who had been with the Agency seven years longer than Fleary.  In addition, the Agency argues that the white employees to whom Fleary compares himself were not similarly situated, and submits salary and employment information to show that these employees either had different job responsibilities or that their higher salaries were due to greater experience and seniority.  Steven Solomon, employed by NYSHFA since 1980, had been a Senior Accountant since October of 1984, and was classified in Salary Band VII.  (Dalley Decl. ¶ 40.)  June Vogt, hired by SONYMA in 1988, had been a Senior Loan Officer in the Single Family Department since 1993.  (*Id*. ¶ 44.) A Senior Loan Officer is a Salary Band VII position responsible for managing SONYMA'S $2.4 billion mortgage loan portfolio,

supervising a staff of three employees, and overseeing foreclosure proceedings and delinquent loans. Joel Danzig, a white Salary Band VI Senior Accountants in the NYSHFA General Ledger Department to which Fleary was transferred, had been with the Agency for more than twenty years longer than Fleary. Seniority and different job responsibilities are legitimate, non-discriminatory reasons for pay disparities. *See, e.g., Fuentes v. City of New York Human Resources Admin.,* 830 F.Supp. 786, 788 (S.D.N.Y. 1993); *Williams v. McCausland*, 782 F.Supp. 272, 278 (S.D.N.Y. 1992). The Agency states that Dominic Martello earned more than Fleary because he was originally hired in 1989 as an Asset Manager, which was at the time classified in Salary Band VII. Even though he was reduced to Salary Band VI as a result of a voluntary job transfer to Assistant Accountant in 2002, and again to Salary Band V as a Project Manager in 2004, his salary could not be decreased pursuant to Article 12 of the Collective Bargaining Agreement. (Def.'s Rep. Mem. Supp., 11, n.4; Def.'s Rep., Dalley Decl., ¶ 8; Def.'s Ex. Y.) "[A] pre-existing, neutral, clear and reasonable rule contained in a collective bargaining agreement," *Murray v. United Parcel Service*, No. 92-CV-2448, 1995 WL 678389, *10 (S.D.N.Y. November 15, 1995), is a legitimate, non-discriminatory reason for the Agency's decision to compensate Martello as it did. Having produced sufficient evidence of non-discriminatory reasons for Fleary's salary level

in comparison to other Agency employees, *Fisher*, 70 F.3d at 1433 (citing *Burdine*, 450 U.S. at 254-55), the Agency has met its burden of production, and the presumption of discrimination "simply drops out of the picture." *St. Mary's*, 509 U.S. at 510-511.

### 3. Fleary's Evidence of Discrimination or Pretext

The burden then shifts to Fleary "to prove that discrimination was the real reason for the employment action," *Graham*, 230 F.3d at 38 (citations omitted), or "to demonstrate that the employer's stated non-discriminatory reasons for the allegedly discriminatory action are pretextual." *Livingston v. ADECCO*, 03-CV-4871, 2005 WL 2305007, *7 (E.D.N.Y., September 21, 2005). A showing of pretext "may or may not be sufficient to sustain a finding of discrimination. . . [W]hether such evidence is sufficient to sustain a finding of discrimination in any given case turns on analysis of the particular evidence in the case." James, 233 F.3d at 157. "On a motion for summary judgment in a discrimination case the plaintiff must provide the trial court with more than his own conclusory allegations declaring discrimination was present." *Forsyth,* 409 F.3d at 573-574 (internal citations omitted). This, Fleary has failed to do. Fleary makes only conclusory assertions that he was paid less than other employees because of his race. He has presented no evidence to establish that the Agency's reasons for its salary

decisions should be disbelieved, let alone evidence from which a fact finder could conclude that the reasons for Fleary's salary were more likely than not discriminatory. Fleary's statement that he did not receive permanent salary increases, (Pl. Mem. Opp'n, 12), is not supported by the evidence. During the applicable period, the Agency's salary records, which are not disputed, show that Fleary's salary was raised from $44,048 in 2000 to $55,369 in 2002. Furthermore, his assertion that following his promotion to Senior Accountant, "[p]ursuant to the same systemic pattern of discrimination, plaintiff was not permitted the salary band VII increase but was intentionally kept at the lower band VI," (*Id.*), ignores the fact that NYSHFA Senior Accountants of all races span both Salary Bands VI and VII. Where, as here, there is no evidence of racial slurs, incidents or circumstances that would indicate that the Agency's explanation was pretextual, I conclude that there are no questions of fact which could lead a rational jury to find intentional discrimination on the part of the Agency. Accordingly, Fleary's claim that he was paid less than other employees because of his race fails as a matter of law.

**Job Transfer**

"An 'adverse employment action' is one that materially changes the terms and conditions of employment." *Richardson v. New York State Dep't of Correctional Serv.*, 180 F.3d 426, 446 (2d

Cir. 1999)(quoting *Torres v. Pisano*, 116 F.3d 625, 640 (2d Cir. 1997)). "A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation." *Galabya v. New York City Bd. of Educ.,* 202 F.3d 636, 640 (2d Cir. 2000) (citing *Crady v. Liberty National Bank and Trust Co. of Indiana*, 993 F.2d 132, 136 (7th Cir. 1993)). In *Galabya*, the Second Circuit granted summary judgment dismissing a plaintiff's adverse employment action claim where the plaintiff failed to produce evidence "to show that the transfer was to an assignment that was materially less prestigious, materially less suited to his skills and expertise, or materially less conducive to career advancement." *Galabya,* 202 F.3d at 641 (teacher's transfer from special education, junior high school keyboarding class to a mainstream high school keyboarding class did not constitute adverse employment action). The Court distinguished its earlier decision in *Rodriguez v. Board of Educ.*, 620 F.2d 362 (2d Cir. 1980), which found that a transfer did constitute an adverse employment action where "it result[ed] in a change in responsibilities so significant as to constitute a setback to the plaintiff's career." *Galabya*, 202 F.3d at 641 (citations omitted) ("Obviously a purely lateral transfer, that is, a

transfer that does not involve a demotion in form or substance, cannot rise to the level of a materially adverse employment action."); *Patrolmen's Benevolent Ass'n v. City of New York*, 74 F. Supp.2d 321, 335 (S.D.N.Y. 1999)("The key inquiry regarding involuntary transfers is whether the transfer constitutes a negative employment action tantamount to a demotion.")(internal quotation omitted).

Fleary claims that his transfer from SONYMA to NYSHFA and the job change from Mortgage Accounting Supervisor to Senior Accountant was a demotion in which he was stripped of his supervisory duties. (Compl. ¶ 15.) The Agency argues that the department change and job transfer was in fact a promotion accompanied by a $2,000 per year salary increase. As Mortgage Accounting Supervisor, Fleary received compensation within salary band VI, with a maximum possible salary of $81,900, and was responsible for supervising mortgage accounting staff, resolving problems with client banks, and preparing reports reconciling mortgage loan balances. In contrast, the Senior Accountant position spans salary bands VI, VII and VIII with a maximum salary of $105,700, and entails developing, examining, reviewing and analyzing financial and accounting records and preparing reports and audits. The Senior Accountants in the NYSHFA General Ledger department to which Fleary was being transferred earned between $66,000 and $80,000 dollars, whereas only one Senior

Accountant in the SONYMA Accounting department earned more than $60,000. Under the standards as set forth above, the transfer cannot be considered a "materially adverse change" in which Fleary's wages, responsibilities, or benefits were so negatively affected as to constitute a demotion. *See* Galabya, 202 F.3d at 640. If the job transfer was not in fact a promotion, as the Agency contends, it was a lateral transfer, which does not constitute a materially adverse employment action or demotion. Fleary has not established a prima facie case of discrimination with respect to his job transfer, and accordingly I grant the Agency's summary judgment motion with respect to this claim.

*Hostile Work Environment Claim*

The Supreme Court has interpreted Title VII to prohibit "requiring people to work in a discriminatorily hostile or abusive environment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17 (1993). A hostile work environment is one in which "the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment." *Id*. at 21. "[H]arms suffered in the workplace are cognizable under Title VII, even when they are not the result of 'tangible employment actions,' if they arise from conduct (1) that is 'objectively' severe or pervasive -- that is, if it creates 'an environment that a reasonable person would find hostile or abusive' [the

'objective' requirement], (2) that the plaintiff 'subjectively
perceives' as hostile or abusive [the 'subjective' requirement],
and (3) that creates such an environment because of plaintiff's
sex (or other characteristic protected by Title VII) [the
'prohibited causal factor' requirement]." *Gregory v. Daly*, 243
F.3d 687, 692 (2d Cir. 2001)(internal citations omitted).

Here Fleary complains that an environment so hostile as to
change the conditions of his employment was created by his
employer's failure to discipline two female employees, both
working under Fleary's supervision, and that this failure to act
was based on his race.  Leaving to one side the question whether
the conduct of the two employees or of either of them was
sufficiently egregious to alter the conditions of Fleary's
employment and the question whether the employees' behavior
occurred because of the employer's failure to discipline them
adequately (both of which questions probably raise factual issues
not appropriate for resolution on a summary judgment motion), the
central problem with Fleary's claim is that he presents no
evidence from which a reasonable fact finder could conclude that
the employer's misconduct was in all likelihood motivated by
plaintiff's race.

The only argument that Fleary makes to suggest racial animus
on the part of his employer is based on an alleged disparity
between the Agency's discipline of two employees under Fleary's

supervision and its discipline of two other employees under the supervision of two white managers.

In this connection, Fleary points to two incidents involving two employees under his supervision occurring over a two-and-a-half-year period. The first incident, involving an employee named Inga Barrington, an African-American woman, occurred in March 2000, when Barrington made a complaint of sexual harassment against Fleary. In response, the Agency's Labor Counsel and Deputy Chief Financial Officer met with Barrington who withdrew her complaint. In February 2002, Barrington again complained about sexual harassment by Fleary. Pursuant to the Agency's "Sexual Harassment in the Workplace Policy," the Agency investigated Barrington's claims, and at Fleary's request removed Barrington from his supervision immediately. Following the investigation, the Agency concluded that Barrington's charges were reckless and without merit, and suspended Barrington without pay for five days. The second incident involved Nora Rubio, an employee of Asian descent, who, in a February 2001 meeting with Fleary, was insubordinate and aggressive when Fleary confronted her about a missed deadline. In August of 2001, Rubio again was abusive towards Fleary and towards the Deputy Chief Financial Officer, Joanne Hounsell. Rubio was subjected to a disciplinary hearing in September 2001, which eventually resulted in her suspension without pay for three weeks commencing on February 27,

2003.

Fleary seeks to compare his situation with that of two white supervisors. He alleges that the Agency provided greater support to Gary Weinstock, a white Assistant Vice President, when Bernie Gross, an employee whom Weinstock supervised, was insubordinate. After receiving a negative performance evaluation on July 25, 2002, Gross was disruptive and made disparaging comments about Weinstock and several Agency executives. On September 9, 2002, in response to this and prior instances of insubordination, the Agency issued a "Letter of Admonition" to Gross, advising him that any further disruptive conduct was unacceptable. The Agency did not bring any formal charges against Gross. (Def.'s Ex. W; Hounsell Decl. ¶ 35.) Fleary also alleges that the Agency provided greater support to June Vogt, a white Supervisor of Mortgage Servicing, in dealing with her subordinate, Dardanella Moore. Moore was alleged to have been late for work more than 80 times in a nine-month period, from January 4 to September 28, 2001. On October 4, 2001, the Agency brought disciplinary charges against Moore, and after a hearing, suspended her without pay for two days and placed her on probation for six months. (Def.'s Ex. U; V.)[19]

_____

[19] Fleary also alleges that the Agency provided greater support to another Caucasian employee, Ana Arnao, by transferring an insubordinate employee, Kim Baez, to another department. However, Fleary has not produced further evidence of or proven any facts relating to this allegation. Moreover, the Agency provides evidence and states in its Rule 56.1 Statement, which is not disputed by Fleary in his Rule 56.1 Statement (and accordingly is

It is apparent from the foregoing recitation of Fleary's allegations that, even accepting them as true, they do not present substantially similar situations. Both the misconduct complained of and the discipline imposed are so different as to provide the finder of fact with no valid basis for comparison. *Shumway v. United Parcel Service, Inc.*, 118 F.3d 60, 64 (2d Cir. 1997) (*citing Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)). Neither of the white supervisors were confronted with a sexual harassment complaint, which under the Agency's policy and by statute must be treated differently than charges of insubordination or tardiness that confronted Weinstock and Vogt. Furthermore, the Agency's response to Rubio's conduct, which recommended termination, included a formal disciplinary hearing, and eventually resulted in her suspension for three weeks without pay, was more severe than any of the disciplinary actions that the Agency sought with respect to the disciplinary problems faced by Vogt and Weinstock.

Although "the incidents comprising a hostile work environment claim need not make reference to any trait or condition on the basis of which the discrimination has occurred," they must occur under circumstances under which "the incidents can reasonably be interpreted as having taken place on the basis

---

deemed admitted by Fleary), that Arnao is not in fact Caucasian. (Def.'s Rule 56.1 Statement, ¶ 92; Def.'s Ex. F at 3.)

of that trait or condition." *Svenningsen v. College of Staten Island*, No. 01-CV-7550, 2003 WL 21143076, *2 (E.D.N.Y. March 28, 2003); *See Gregory v. Daly*, 243 F.3d 687, 694-695 (2d Cir. 2001). In the present case, plaintiff makes no allegations, from which "the incidents can reasonably be interpreted as having taken place on the basis of [race]". *Id*. at 692. Accordingly, no reasonable juror could conclude that any hostile work environment under which plaintiff labored was brought about by his employer because of plaintiff's race. Accordingly, Fleary's hostile work environment claim fails as a matter of law.

*Constructive Discharge Claim*

"To prove constructive discharge [under Title VII], plaintiff must show that a reasonable person subjected to the working conditions experienced by plaintiff would have felt compelled to resign." *Viera v. Olsten/Kimberly Quality Care*, 63 F.Supp. 2d 413, 418-419 (S.D.N.Y. 1999)(citations omitted). For an employee to be constructively discharged within the meaning of Title VII, an employer must "deliberately [make] his working conditions so intolerable that he [is] forced into an involuntary resignation." *Kirsch v. Fleet Street, Ltd.*, 148 F.3d 149, 161 (2d Cir.1998)(quoting *Pena v. Brattleboro Retreat*, 702 F.2d 322, 325 (2d Cir.1983)). "The employee's subjective assessment of working conditions as 'intolerable' is insufficient . . . and merely difficult or unpleasant working conditions do not rise to

the level of constructive discharge." *Viera*, 63 F.Supp. 2d at
418-419 (internal citations and quotations omitted). "A change
in job responsibilities with no decrease in pay or benefits does
not reach the threshold required for a viable constructive
discharge claim." *Id.* (citing Pena, 702 F.2d at 326; *Stetson v.
NYNEX Service Co.*, 995 F.2d 355, 360 (2d Cir. 1993)).

Fleary alleges that he was constructively discharged because
management "dismissed [his] medical diagnoses and condition and
demanded that [he] return to work which placed Mr. Fleary under
additional stress since to return to work would mean subjecting
himself to further harassment and hostility." (Compl. ¶ 33.)
Fleary argues that the Agency discounted and ignored the advice
of his treating physician who, as recently as March 13, 2003,
stated that Fleary was continuing to be treated for a Major
Depressive Disorder, that he was incapacitated, and that he was
still unable to work. (Pl.'s Ex. 3 at 8.) Essentially, he
argues that to return to work would subject him to the same
hostile work environment that contributed to his mental illness.
The Agency's demand that Fleary return to work after more than
four months of paid sick leave does not rise to the level of
intentional and objectively intolerable conduct that would compel
a reasonable person to resign as required by the courts in this
circuit and elsewhere. *See, e.g. Stetson*, 995 F.2d at 361.
Having failed to establish prima facie evidence that Fleary was

subjected to a hostile work environment or that his job transfer constituted an adverse employment action, there is similarly no basis for a "rational trier of fact to infer that the employer deliberately created working conditions that were so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Id*. For these reasons, defendant's motion for summary judgment on Fleary's constructive discharge claim is granted.[20]

## CONCLUSION

For the foregoing reasons, the Agency's motion for summary judgment is granted, and the plaintiff's complaint is dismissed.

The Clerk is directed to furnish a filed copy of the within to all parties and to the magistrate judge and to enter judgment dismissing the complaint.

SO ORDERED.

Dated :    Brooklyn, New York

           February 13, 2006


                    By: /s/ Charles P. Sifton (electronically signed)
                        United States District Judge

---

[20] Because I conclude that Fleary's constructive discharge claim has no merit, I need not address the Agency's argument that Fleary's constructive discharge claim should be dismissed for failure to exhaust administrative remedies.